



## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

MICHAEL SCOTT WARD
      d/b/a FEREDONNA COMMUNICATIONS,
WEDO FUNDRAISING, INC., &
PRINTVENTURE, INC.,

      Plaintiffs,

v.

KNOX COUNTY BOARD OF EDUCATION,
KNOX COUNTY,
SCOTT BACON, MARY KERR, &
WALSWORTH PUBLISHING COMPANY, INC.

      Defendants.

Docket No.: 3:11cv438

Varlan/Shirley

---

## VERIFIED COMPLAINT FOR EMERGENCY AND PERMANENT
## INJUNCTIVE RELIEF AND FOR DAMAGES

---

      Come the Plaintiffs by and through under-signed counsel and for their complaint for emergency injunctive relief, permanent injunction, and for damages against the Defendants herein would state to this Honorable Court as follows:

### PARTIES

      1.    Plaintiff, Michael Scott Ward ("Ward"), is a citizen and resident of Knox County, Tennessee;

      2.    Plaintiff, WeDo Fundraising, Inc. ("WeDo Fundraising"), is a corporation formed as such under the laws of the state of Tennessee with Ward as its principal

1

shareholder, and has its principal place of business located at 12700 Sauer Point, Knoxville, Tennessee 37934;

3. Plaintiff, PrintVenture, Inc. ("PrintVenture"), was a corporation formed as such under the laws of the state of Tennessee with Ward as its principal shareholder, and had its principal place of business located at 9815 Cogdill Road, Knoxville, Tennessee 37932;

4. Ward, WeDo Fundraising, and PrintVenture all conduct business under the trade name Feredonna Communications ("Feredonna");

5. Feredonna is a publisher that has over eighteen years of experience in designing, branding, publishing, printing, and distributing fundraising materials;

6. Feredonna also has over eighteen years of experience in organizing, marketing, managing, and conducting fundraising campaigns, including fundraising campaigns for schools and school districts in Alabama, Georgia, Ohio, and Tennessee;

7. Defendant, Knox County Board of Education ("Knox County Schools"), is an agency of Knox County, vested with the management and control of the Knox County school system and is the ultimate policy-making body with regard to all policy determinations in the operation of the school system. Knox County Schools may be served with process through the Knox County Law Director Joseph G. Jarret at Suite 612, City-County Building, 400 Main Street, Knoxville, Tennessee 37902-2405;

8. Defendant, Knox County, is a municipal corporation organized and existing as such under the laws of the State of Tennessee. Knox County Schools may be

2

served with process through the Knox County Law Director Joseph G. Jarret at Suite 612, City-County Building, 400 Main Street, Knoxville, Tennessee 37902-2405;

9.      Defendant, Scott Bacon ("Bacon"), is a citizen and resident of Knox County, Tennessee. Bacon may be served at his place of work, 912 South Gay Street, Knoxville, Tennessee 37901;

10.     Defendant, Mary Kerr ("Kerr"), is a citizen and resident of Knox County, Tennessee. Kerr may be served at her place of work, 912 South Gay Street, Knoxville, Tennessee 37901;

11.     Defendants Bacon and Kerr, at all relevant times, were Knox County Schools employees;

12.     Defendant Walsworth Publishing Company, Inc. ("Walsworth") is a corporation formed as such under the laws of the state of Missouri and has its principal place of business located at 306 North Kansas Avenue, Marceline, Missouri 64658. Walsworth can be served through its registered agent, D.O. Walsworth, at 306 North Kansas Avenue, Marceline, Missouri 64658;

## JURISDICTION AND VENUE

13.     Jurisdiction is proper before this Honorable Court because there is federal question subject matter pursuant to 28 U.S.C. §1331; 15 U.S.C. §1051, et seq.; and 17 U.S.C. §101, et seq.;

14.     Venue is proper before this Honorable Court because torts committed by the Defendants herein were committed and, should they continue, will be committed in Knox County, Tennessee;

3

## FACTS GIVING RISE TO CAUSE OF ACTION

### Feredonna's Development of the School Coupons® Brand

15.     In 1994, Knox County Schools awarded Feredonna the contract for a system-wide fundraising program centered around the sale of a coupon book;

16.     Independent from the coupon book program, Feredonna contracted with Knox County Schools to provide other materials, such as curriculum guides;

17.     Over the course of seventeen years, Feredonna's role in the coupon book program included assistance with merchant and sponsor recruitment, branded merchandise and materials, and other aspects of the coupon book program not traditionally provided by a printing company;

18.     Feredonna designed a completely new format for the coupons and book design;

19.     Feredonna introduced a standardized branding and placement for merchant sponsors, both on the coupon book covers and throughout its pages and coupons;

20.     Feredonna tabbed coupons with merchant names;

21.     Feredonna developed cover photo recognition to reward top-selling students;

22.     Feredonna developed styles guides to standardize wording and offer descriptions for the coupons;

23.     Feredonna's innovations enhanced the image of the coupon books, thereby increasing their value to Knox County Schools;

4

24.     Feredonna continues to use this trade dress, as the standardization enhances the brand of program materials, thereby enhancing the revenues generated by the fundraising campaigns that use the materials;

## Feredonna's Trademarks and Copyrights

25.     Feredonna used the trade name "School Coupons" on coupon book fundraising products at least as early as 1994;

26.     Feredonna subsequently sought and received federal trademark registration of the "School Coupons" mark (Supplemental Register, serial number 75365161);

27.     Feredonna notified in writing Knox County Schools and Jefferson County, Alabama, the two markets in which it produced and published coupon book programs at that time, that it was registering the "School Coupons" trade name;

28.     Neither Knox County nor Jefferson County, Alabama contested the registration of School Coupons®;

29.     Feredonna began claiming copyright rights to the School Coupons® coupon books and their design, format, layout, and contents that they were producing for the Knox County Schools as early as 1998, and perhaps earlier;

30.     Feredonna claimed such copyright rights with Knox County Schools' knowledge and assent;

31.     Feredonna registered its copyright;

32.     Knox County Schools claimed no trademarks or copyrights related to the School Coupons® program produced by Feredonna for the Knox County Schools;

5

33.     In 2001, Feredonna registered the web domain "schoolcoupons.com" and developed a company website;

34.     Shortly thereafter, Knox County Schools registered the web domain "schoolcoupons.org;"

35.     Feredonna claimed infringement and demanded the web domain be relinquished by Knox County Schools to Feredonna;

36.     Knox County Schools relinquished the infringing website without further action;

37.     Feredonna     also     currently     owns     "schoolcoupons.net"     and "schoolcoupons.info;"

## Sale of Coupon Books Inside and Outside of Knox County Schools

38.     Feredonna published the School Coupons® program for individual schools and school districts throughout East Tennessee and for private and parochial schools, in addition to those for Knox County Schools;

39.     At this time, Feredonna also produced fundraising programs under the School Coupons® brand in Birmingham, Alabama; Cleveland, Ohio; and Nashville, Tennessee;

40.     As the relationship between Feredonna and Knox County Schools developed, an unwritten division of responsibilities also developed – Knox County was responsible for merchant recruitment for the book inside Knox County, and Feredonna was responsible for merchant recruitment outside Knox County, and for any regional or

6

national merchant accounts (this was in addition to Feredonna's role in the design, development, and publishing of the School Coupons® branded materials);

41. The practical result of this particular arrangement was that Feredonna had little direct dealings with many Knox County-based merchants, although all merchants participating in the School Coupons® program contracted with Feredonna;

## Bacon Destroys the Relationship Between Feredonna and Knox County Schools

42. At several events, including outreach and launch events, Bacon tried to claim credit for the School Coupons® program;

43. Bacon regularly referred to Feredonna as merely the printer of the School Coupons® coupon book;

44. Whenever Bacon made such statements about Feredonna in front of Ward, Ward corrected him, albeit in a diplomatic way by noting that Feredonna developed, produced, and published the School Coupons® coupon book on behalf of its client, Knox County Schools, and that Bacon was an employee of Knox County Schools;

45. In March 2008, Ward organized a meeting between Feredonna and Knox County Schools to discuss the upcoming 20th anniversary campaign of the School Coupons® program;

46. Bacon, Kerr, Ward, and one of Ward's employees, Alanna Fletcher ("Fletcher"), attended the meeting;

47. Ward suggested that the 20th anniversary campaign provided an opportunity to raise the price of the School Coupons® book (thereby increasing revenue

7

to Knox County Schools) and to introduce a new discount card program that could be developed into a spin-off fundraising campaign;

48.     Additionally, one of the reasons Feredonna sought to develop a discount card product is because many fundraising companies offer more than one product so as to better meet the needs of schools that traditionally hold two or more fundraisers per year;

49.     Ward's proposal at that time was to add a loyalty-card style discount card into the School Coupons® book that could be removed and used at the participating merchants' businesses repeatedly and, thus, add to the overall value of the product;

50.     Bacon flatly refused the suggestion of a price increase under any circumstances, stating "the book will always be ten dollars;"

51.     Despite his refusal of a price increase, Bacon expressed serious interest in the discount card concept, saying that he wanted "full control" and "ownership" over it;

52.     Ward understood Bacon's comments to mean that in order for Bacon to approve any discount card program, Bacon would have to receive some sort of financial interest or benefit in it;

53.     After Bacon dismissed the discount card-in-book concept, Ward continued developing the discount card as a stand-alone product, with the goal of introducing it as a spring fundraising program;

8

54. Due to Bacon's expressed desire to "own" the discount card program, Ward decided to first develop it into a viable product and then present the opportunity for participation to Knox County Schools;

55. Ward finalized the discount card concept by January 2009 and began recruiting merchant participation in the discount card program;

56. Ward suffered a heart-attack in March 2009 and was unable to maintain his level of involvement in the day-to-day operations of the business, but his employees continued to work on the discount card program throughout this period;

57. In April 2009, Ward received a telephone call from a very irate Bacon – Bacon had "caught wind" of Ward's efforts to develop a working prototype of the card product, and he was furious;

58. Bacon threatened that no schools would sell the discount card without Bacon's "involvement," and "ownership;"

59. Ward understood "involvement," and "ownership" to mean "personal benefit;"

60. Despite his recent health issues, Ward offered to meet with Bacon and Kerr as soon as possible, and a meeting was held a week later;

61. At the meeting, Bacon was still belligerent that Ward had developed the discount card project without Bacon's personal involvement;

62. Bacon reasserted his earlier demand that he wanted "ownership" of the card, and he reminded Ward of his having stated the same in their prior meeting;

9

63. In the fundraising industry, most fundraising companies pay only 25 – 50% of campaign revenue to the campaign beneficiary, e.g. Knox County Schools;

64. Despite this, Ward offered to give Knox County Schools 80% of all the proceeds raised through the sale of the discount cards, and Ward added that he was not concerned about how Knox County Schools (practically speaking, Bacon) chose to divide the proceeds across the school district;

65. Under Ward's proposal, there would have been no requirement for any further commitment by Knox County Schools administration in the discount card program for the schools and district to receive this benefit, aside from embracing the program and selling the discount cards;

66. Bacon stated that there was "no way the card was costing [Ward] $4 per card to produce" (a figure based on Ward's net on a $20 card, after 80% payment to Knox County Schools);

67. Upon information and belief, Bacon wanted Ward to sell him the discount cards for the cost of printing, allowing Bacon either to reap the profits personally as a middle-man re-selling to Knox County Schools and/or to allow Bacon to take credit for the program, thereby allowing him to later become such a middle-man;

68. Upon information and belief, Bacon is contemplating developing a similar discount card program of his own, copying Ward's concept;

69. Ward viewed Bacon's demands of "ownership" and threats that "no schools would sell the card" without Bacon's involvement as an act of extortion;

10

70.     Bacon and Kerr also rebuffed all subsequent attempts to offer the discount card program to Knox County Schools;

## Bacon and Kerr Undermine Feredonna's Relationship with Knox County; Prevent Discount Card Sales

71.     Following Ward's April 2009 meeting with Bacon and Kerr, Feredonna's representatives began encountering merchants who refused to participate in the discount card program specifically because of information received from Bacon or Kerr;

72.     Upon information and belief, Bacon and Kerr worked together to derail the discount card program by, among other things, discouraging merchant participation and tortiously inserting themselves into Feredonna's relationships with its clients;

73.     Knox County Schools, by altering and even cutting contract documents, began to deny Feredonna access to merchant contact information on merchants participating in the School Coupons® program;

74.     Some of the contracts affected were for merchants that conducted business with Feredonna before they were introduced to Knox County Schools through School Coupons®;

75.     Upon information and belief, Knox County Schools altered and/or destroyed these contractual documents at the direction of Bacon and Kerr, and that Kerr personally altered and destroyed many documents;

76.     In May 2009, Ward met with Russ Oakes ("Oakes"), Bacon's immediate supervisor, to diplomatically put an end to Bacon's and Kerr's efforts to discourage merchants from doing business with Feredonna;

11

77.     In his meeting with Oakes, Ward discussed ways to streamline coupon book merchant recruitment, offered the discount card program to Knox County Schools again at a greatly reduced rate, raised the issue of Bacon's and Kerr's destruction of documents, and otherwise informed him that Bacon's and Kerr's insertion of themselves into Feredonna's business dealings was inappropriate at best;

78.     Although Ward's working relationship with Oakes had been good, after their meeting, the working relationship with Oakes chilled considerably;

79.     Knox County Schools, through Oakes, cancelled a major printing project for school curriculum guides that Feredonna had produced for many years, costing Ward approximately $22,000 in net lost earnings in 2009 and a comparable amount in 2010 and 2011;

80.     Knox County Schools also did not exercise their option to renew the contract for print management and design services under which the school curriculum guides and other materials had been produced;

81.     Upon information and belief, the cancellation of the school curriculum guides project and other printing and design work was a direct result of Bacon's and Kerr's influence and constituted Knox County Schools' tacit endorsement of and participation in their conduct;

82.     Feredonna pressed forward with the discount card program in East Tennessee, hiring eight sales representatives, many of whom had substantial prior fundraising experience, to make sales calls for the discount card program;

12

83. The East Tennessee discount card program was initially well received, and Feredonna estimated conservatively that at least three of its sales representatives would meet minimum sales goals of 10,000 cards each in 2010;

84. However, within days of the beginning of initial sales calls, an undated memo went out to all Knox County schools directing them to not do business or have any contact with Feredonna because it was purportedly not an approved vendor;

85. Upon information and belief, this memo was sent out at Bacon's direction;

86. When Ward learned of this memo, he investigated in the belief that it was a simple confusion because, at that time, Feredonna's vendor account with Knox County was listed as "PrintVenture Inc., also DBA Feredonna;"

87. The sales representative who first learned of the memo confirmed through a school principal that PrintVenture was indeed on the "approved" vendor list at the time the memo was sent to the schools;

88. R. Deno Cole, an attorney who serves as Feredonna's general corporate counsel, sent a letter to Knox County Schools on November 20, 2009, demanding immediate retraction of the memo (see Exhibit 1);

89. By the time an attorney for Knox County Schools responded in a letter dated December 9, 2009, all of Feredonna's sales representatives had quit;

90. Knox County Schools' response was to stand on the position taken in the memo (see Exhibit 2);

91. The Defendants' misinformation campaign was so thorough that at least one of Feredonna's sales representatives was confronted with the fabrication that

13

Feredonna was merely a printer and that Knox County Schools owned School Coupons®;

92. Feredonna lost sales of over \$250,000 on the discount card program in 2010 alone as a result of the memo's effect on schools and sales representatives;

93. Later, on Defendants' insistence, Knox County cancelled PrintVenture's approved vendor status on the grounds of alleged back business tangible personal property taxes owed;

94. The alleged tax issues cited as the basis of PrintVenture's cancellation had been addressed almost ten years prior and had been believed resolved;

95. Over the course of intervening years, PrintVenture had received no following correspondence from Knox County concerning the alleged tax issues;

96. Over the course of intervening years, the alleged tax issue had never been an impediment to PrintVenture servicing contracts with the County, including the contract for the School Coupons® program;

97. Hugh Holt ("Holt"), Knox County's Director of Purchasing, informed Ward that Bacon specifically raised the tax issue to him in an effort to cancel PrintVenture's vendor status;

98. Holt informed Ward that Knox County Schools' counsel, Martha McCampbell ("McCampbell"), had determined that the tax issue was sufficient grounds to merit termination of PrintVenture's vendor status;

14

99.     PrintVenture, therefore, could not bid on new business from either Knox County Schools or Knox County as a result of the wrongful termination of its vendor status;

100.    Ever since the Defendants raised the alleged back tax issue, all efforts by PrintVenture to resolve the tax issue with Knox County have been rebuffed;

## Conspiracy to Block Sales of Feredonna Products to Knox County Schools

101.    When PrintVenture lost its approved vendor status with Knox County in late 2009, Jeffrey Hobbs ("Hobbs") assisted Ward in investigating the process by which businesses can be added to or removed from the approved vendor list (see Exhibit 3, Affidavit of Jeffrey Hobbs);

102.    Knox County maintains an online application system for vendors to register themselves for the approved vendor list;

103.    Hobbs began the process of registering Jireh Group, LLC ("Jireh Group"), a Tennessee Limited Liability Company that he owns, for Knox County's approved vendor list through the online registration system;

104.    The online registration system asked for basic information concerning Hobbs' business, such as tax identification numbers and contact information;

105.    There was nothing in the registration application that required credit information or character references;

106.    When Hobbs had difficulties completing Jireh Group's application through the online system, Hobbs called the "help" number provided by the online system and talked with a representative from Knox County;

15

107. The Knox County representative assisted Hobbs in completing the application over the phone;

108. When the application process was complete, the representative asked Hobbs if there were any open items or projects that he'd like to bid on, giving him the understanding that she would assist him right then with the bidding process;

109. Hobbs said that he was not bidding on any open projects right at that moment, and then he asked her what sort of reasons could justify a vendor being removed from the approved vendor list;

110. The Knox County representative said that fraud, criminal activity, and similar issues would be the only legitimate reason for removing a business from the approved vendor list;

111. Hobbs also asked whether there was a separate vendor list that he had to add Jireh Group to before he could start soliciting Knox County Schools for the sale of fundraising products;

112. The Knox County representative informed him that there was no such additional list;

113. At a subsequent meeting between Ward, Cole, McCampbell, and others, McCampbell asserted that a separate fundraising company approval process existed, as did a list of approved fundraising vendors;

114. Knox County and Knox County Schools have failed to produce any list of approved fundraising companies in response to Open Documents requests;

16

115.    Upon information and belief, no approval process or approved fundraising list existed at that time or currently;

116.    Upon information and belief, no other fundraising company conducting business in Knox County has been asked to submit to such a process, and many fundraising companies conducting business with Knox County Schools are not even registered through the Knox County purchasing office;

117.    Upon information and belief, the memo sent to schools directing schools not to do business with Feredonna, and the attempt to require Feredonna to submit to an approval process, is without precedent and solely directed at denying Feredonna the opportunity to conduct business with Knox County Schools;

118.    Upon information and belief, Bacon instigated the sending of the memo in retaliation for Ward's refusal to offer Bacon a personal interest in the development of the discount card program;

## Infringement and Interference

119.    Even though the Knox County Schools refused to participate in Feredonna's discount card program, Knox County Schools proceeded with the sale of the School Coupons® book in 2009;

120.    When the School Coupons® book went on sale in September 2009, signage at Knox County schools did not include either the School Coupons® name or logo as it had in prior years, but instead used "Knox County Schools Coupon Book;"

17

121.    Bacon consistently failed to include the "®" registration mark with the School Coupons® logo, and frequently used the name in an incorrect type font as a logo;

122.    Feredonna repeatedly sent correspondence and corrected logo artwork to Bacon and Knox County Schools in an effort to address these "oversights;"

123.    Upon information and belief, this was an intentional act of omission in an attempt to undermine or diminish the integrity of the School Coupons® trademark;

124.    In January 2010, Bacon and Kerr sent a letter on behalf of Knox County Schools to past participating merchants in the School Coupons® program;

125.    Upon information and belief the letter claimed credit for the School Coupons® program while portraying Feredonna in a negative light, diminishing Feredonna's ownership and contributions;

126.    Upon information and belief, the letter announced an intention to "re-brand" the School Coupons® program;

127.    On February 5, 2010, Bacon and Kerr sent a follow-up letter on behalf of Knox County Schools (see Exhibit 4, hereinafter the "February Letter");

128.    The February Letter sought to steal all credit for past program success, and it included several damaging and false statements;

129.    The February Letter claimed that "the product that has been known as the School Coupons Campaign will now be known as the Knox County Schools Coupon Book" and used other deceptive phrases such as "Same Book, New Look;"

18

130. The February Letter, specifically its reference to School Coupons® and its misrepresentation of the "Knox County Schools Coupon Book" as School Coupons®, was an explicit and direct infringement on Feredonna's School Coupons® trademark;

131. Feredonna responded in writing to the February Letter, warning Knox County Schools that it was infringing upon Feredonna's trademark and copyright rights, and it demanded Knox County Schools cease and desist from going forward with plans to produce a rival coupon book (see Exhibit 5);

## March 2010 – Meeting with Mayor Ragsdale

132. Feredonna copied then-Mayor Ragsdale on its cease and desist letter to Knox County Schools, requesting Mayor Ragsdale's involvement to resolve the situation;

133. Mayor Ragsdale's office quickly contacted Feredonna's counsel to schedule a meeting;

134. Ward, Cole, Ragsdale, and then-County Law Director Lockett attended the meeting;

135. Near the conclusion of the meeting, Mayor Ragsdale stated something to the effect that, "What I want to know is why are we suddenly not doing business with this guy who has done a great job for us for over fifteen years. In the time I've been Mayor, I have not heard anything but good things about him. Well, I started asking around and the word I'm hearing in the halls is that we have a Knox County employee nearing retirement age and he is posturing himself to take over the program when he

19

retires and needs Mr. Ward out of the picture. I'm not really sure how I feel about that;"

136.    Mayor Ragsdale also made similar statements in an earlier meeting with Ward and Hobbs;

137.    The participants in the meetings understood that the Knox County Schools employee to which Mayor Ragsdale was referring was Bacon;

## Defendants' Ongoing Interference and Infringement

138.    Meanwhile, Feredonna actively recruited merchants for the 2010 School Coupons® program for the Greater East Tennessee edition, on behalf of its client schools in Knox County and surrounding counties;

139.    Merchants that had dealt almost exclusively, or at least primarily, with Feredonna responded quickly and affirmatively;

140.    Several merchants who had primarily worked with Bacon and Kerr did not renew their participation, including several merchants that had previously participated in both the Knox County and Greater East Tennessee editions of School Coupons®;

141.    Several merchants informed Ward that they would not participate in the 2010 School Coupons® program because of what they "heard" about Feredonna from Bacon and Kerr;

142.    Approximately 230 merchants participated in the Greater East Tennessee 2010 School Coupons® program, but approximately 25 merchants from the 2009 program declined to continue participation;

20

143.    The results of merchants refusing to continue participating is a decline in the perceived value of the book, and ultimately lower sales of the School Coupons® books;

144.    Area McDonald's franchisees reneged on their sponsorship commitment for the 2010 School Coupons® program for the Greater East Tennessee edition after receiving all of the benefits associated with sponsorship, citing after the fact that they only wanted to support the Knox County Schools program;

145.    Upon information and belief, this default and other cancellations were the direct result of disinformation spread by the Defendants;

146.    In 2011, when Feredonna began actively recruiting for the 2011 School Coupons® book, Feredonna's representatives as well as Ward encountered merchants who declined to renew their participation in the School Coupons® program, many stating they were only participating in the "original" or "County" book (see Exhibit 6, Affidavit of Aaron Schmissrauter);

147.    Several merchants told Feredonna representatives that they would not renew their participation in the 2011 School Coupons® program because of a letter they received from Knox County Schools (see id.);

148.    In some cases, merchants stated they were told by Bacon or Kerr to not participate in the School Coupons® book;

149.    Upon information and belief, Bacon and Kerr pressured merchants to specifically not participate in the School Coupons® book, suggesting that it might influence their decision to include them in Knox County Schools' coupon book;

21

**Bidding (and Rebidding) on the 2010 Knox County Coupon Book**

150. In late 2009, Feredonna proffered a proposal to extend the terms of the current contract with Knox County Schools and commit to a three-year price freeze as well as other incentives that would have benefitted Knox County Schools by as much as $100,000 per year;

151. This proposal was made through Mayor Ragsdale's office, and Mayor Ragsdale forwarded the proposal to Holt;

152. In May 2010, Knox County failed to receive a qualified bid for less than the amount of Feredonna's prior proposal;

153. Upon information and belief, Bacon directed Knox County purchasing to rebid the project rather than consider Feredonna's proposal;

154. The specifications for the coupon book requested in the 2010 bid were identical to the specifications of the book published by Feredonna previously for Knox County Schools;

155. The bidding criteria and evaluation changed significantly from that of prior bids, however, relying solely on price and excluding any evaluation for other criteria;

156. Knox County Schools, through McCampbell, upon hearing the project had been rebid, suggested that Feredonna submit a proposal as a means of possibly resolving the infringement issues;

22

157.   Ward pointed out that Knox County, through McCampbell's office, cancelled PrintVenture's vendor status, which prohibited it from bidding on the original request and would prohibit it again from participating in the rebid;

158.   McCampbell stated that PrintVenture's vendor status would be reinstated to allow him to rebid;

159.   PrintVenture and WeDo Fundraising, which Ward had recently formed and successfully placed on Knox County's "approved" vendor list, submitted identical bids on the rebid;

160.   Walsworth, a printer previously unknown to Knox County Schools placed an online bid at a significantly lower price, however, and received the contract;

161.   Although Bacon later emphatically stated the lower price was the only reason for ending the relationship with Feredonna, Knox County Schools had no prior knowledge of how much Walsworth's or any other future bid's amount might have been when it publicly announced the "re-branding" in 2010;

162.   However, Bacon emphatically, falsely, and publicly stated this lower price was the only reason for the change;

163.   Ward independently contacted Walsworth to request a price quote and received a quote more than double the bid that Walsworth offered to Knox County Schools;

164.   Upon information and belief, Walsworth bid the Knox County Schools' coupon book project below cost for the 2010-2011 program so that it could substantially

23

raise prices for subsequent years or, alternatively, so that it could gain leverage on other printing for Knox County Schools;

165. Ward also contacted a printer that was rejected in the original bidding process, which was rejected because it could not cut the coupon books apart after printing and binding;

166. Ward learned that the rejected bidder suggested to Bacon a plan for printing the books and sending them to Feredonna's bindery for finishing, but Bacon emphatically rejected the proposal, stating they "would not be doing business with Ward;"

167. After the rebidding, Knox County again cancelled PrintVenture's vendor status;

## Trademark, Trade Dress, and Copyright Infringement – 2010 and 2011

168. After denying Feredonna the contract for School Coupons®, Defendants created and distributed a coupon book that clearly appropriates material trademarked and copyrighted by Feredonna;

169. The February Letter's reference to School Coupons® and its misrepresentation of the "Knox County Schools Coupon Book" as School Coupons® was an explicit and direct infringement on Feredonna's School Coupons® trademark;

170. The Defendants created and distributed a coupon book that intentionally mimics the "trade dress" of material trademarked and copyrighted by Feredonna and is clearly derivative work;

24

171. The Defendants clearly had access to Feredonna's trademarked and copyrighted materials;

172. The coupon book Defendants created and distributed in 2010 (the "2010 Book") is strikingly similar in format, layout, and coupon design as trademarked and copyrighted material in the School Coupons® coupon book (see Exhibit 7, a comparison of the 2010 Book and 2009 School Coupons® book);

173. Like the School Coupons® coupon book, the 2010 Book is rectangular and approximately check-sized in shape, having the same dimensions (see id.);

174. Like the School Coupons® book, the 2010 Book features the logo of the presenting sponsor on the bottom center of the front cover (see id.);

175. Like the School Coupons® book, the 2010 Book displays the logos of other major sponsors in a vertical row on the side of the front cover (see id.);

176. Like the School Coupons® book, the 2010 Book includes a photograph of a top-selling student of coupon books from the prior campaign in an identical layout, design and fashion, previously unique to the School Coupons® coupon book (see id.);

177. The 2010 Book adopts strikingly similar, if not practically identical, format, layout, and content as the School Coupons® coupon book for the coupons contained within the book (see Exhibit 8, a comparison of a coupon in the 2010 Book and 2009 School Coupons® book);

178. There are additional ways in which the 2010 Book is strikingly similar and clearly a derivative work, if not practically identical, in format, layout, and content as the School Coupons® coupon book;

25

179.  The coupon book Defendants created for distribution in 2011 (the "2011 Book") is almost identical and strikingly similar in format, layout, and content as trademarked and copyrighted material in the School Coupons® coupon book (see Exhibit 9, artwork associated with the 2011 Book);

180.  Like the School Coupons® coupon book, the 2011 Book is rectangular and approximately check-sized in shape (see id.);

181.  Like the School Coupons® coupon book, the 2011 Book features the logo of the presenting sponsor on the bottom center of the front cover (see id.);

182.  Like the School Coupons® coupon book, the 2011 Book displays the logos of other major sponsors in a vertical row on the side of the front cover (see id.);

183.  Like the School Coupons® coupon book, the 2011 Book includes a photograph of a top-selling student of coupon books from the prior campaign (see id.);

184.  There are additional ways in which the 2011 Book is practically identical in format, layout, and content as the School Coupons® coupon book;

185.  Through its prior relationship with Feredonna, Defendants Knox County Schools, Bacon, and Kerr were on notice of Feredonna's assertion of trademark and copyright rights to School Coupons® materials;

186.  Defendant Walsworth was on notice of Feredonna's assertion of trademark and copyright rights to School Coupons® materials from specifications and samples provided to it from Defendants Knox County Schools, Bacon, and Kerr;

187.  The Defendants acted willfully in appropriating materials trademarked and copyrighted by Feredonna;

188.    The 2010 Book and the 2011 Book refer to themselves as "The Original Knox County Schools Coupon Book Established 1989" in a deliberate attempt to confuse and mislead consumers;

189.    Defendants advertised the 2010 Book in an intentionally misleading way, with ad content in local papers that included false statements such as "SAME BOOK, NEW LOOK!" (see Exhibit 10, *Knox News Sentinel*, October 6, 2010, A11);

190.    Defendants admitted through press releases sent to local media that the 2010 Book was so similar to other coupon books in the market (meaning the School Coupons® coupon book) as to merit caution as to which book was produced by Knox County schools (see, e.g., Exhibit 11, *Farragut Press*, Sept. 9, 2010) (Defendant Kerr quoted, "People are seeing that book and I have been getting calls from people saying, 'someone is already selling coupon books.' And we always had this almost sacred thing that nobody started until the starting date." and "Private schools are out there selling now and it looks like the same book as last year, so people think it is our book and they are buying it."; Exhibit 12, *Knox County re-brands school coupon book; saves nearly $100,000*, www.WATE.com, (quoting Bacon, "It did us between $95,000 to $100,000 net over what we paid last year for a very similar product, same size, same look, you name it.")

191.    In the form of revenues obtained by the sale of the 2010 Book, among other things, the Defendants have benefitted as a result of their appropriation of materials trademarked and copyrighted by Feredonna;

192.    Defendant Knox County Schools earned a profit of $1,319,832.50 from sales of the 2010 Book;

27

193. In the form of revenues obtained by the sale of the 2011 Book, among other things, the Defendants stand to benefit as a result of their appropriation of materials trademarked and copyrighted by Feredonna by a similar or greater amount;

## Knox County Schools' Aggressive Overreach

194. In 2011, the Defendants began aggressive solicitation of schools outside the Knox County Schools system to induce them to sell the 2011 Book;

195. The Defendants have behaved as a private fundraising company, in clear and direct competition with Feredonna in an effort to further harm Feredonna's Business and Sales;

196. The solicitation of schools outside the Knox County Schools system, behaving as a private fundraising company, clearly demonstrates Bacon and Kerr are acting outside their job responsibilities;

## APPLICATIONS FOR EXTRAORDINARY RELIEF

## FIRST APPLICATION FOR EXTRAORDINARY EQUITABLE RELIEF:

## TEMPORARY RESTRAINING ORDER

197. Plaintiffs restate paragraphs 1-196 above in support of its First Request for Equitable Relief;

198. Defendants have violated Plaintiffs' trademark, trade dress, and copyright rights under 15 U.S.C. §1051, et seq. and 17 U.S.C. §101, et seq.;

199. Plaintiffs will be irreparably harmed by Defendants' further infringement of its trademark, trade dress, and copyright rights;

28

200.     Pursuant to 15 U.S.C. §1116; 17 U.S.C. §502; and Federal Rule of Civil Procedure 65(b), Plaintiffs request the Court issue a Temporary Restraining Order, prohibiting Defendants from violating Plaintiffs' trademark, trade dress, and copyright rights through the Defendants' marketing, distribution, and sale of the so-called "Original Knox County Schools Coupon Book."

## SECOND APPLICATION FOR EXTRAORDINARY EQUITABLE RELIEF:

### PRELIMINARY INJUNCTION

201.     Plaintiffs restate paragraphs 1-196 above in support of its First Request for Equitable Relief;

202.     Defendants have violated Plaintiffs' trademark, trade dress, and copyright rights under 15 U.S.C. §1051, et seq. and 17 U.S.C. §101, et seq.;

203.     Plaintiffs will be irreparably harmed by Defendants' further infringement of its trademark, trade dress, and copyright rights;

204.     Pursuant to 15 U.S.C. §1116; 17 U.S.C. §502; and Rule 65(a), Plaintiffs request the Court issue a Preliminary Injunction, prohibiting Defendants from violating Plaintiffs' trademark, trade dress, and copyright rights through the Defendants' marketing, distribution, and sale of the so-called "Original Knox County Schools Coupon Book" until a decision on the merits can be reached in this case.

## ALTERNATIVE TO APPLICATION FOR EXTRAORDINARY EQUITABLE RELIEF:

### SEQUESTRATION OF PROCEEDS

205.     Plaintiffs restate paragraphs 1-196 above in support of its Alternative to Application for Extraordinary Equitable Relief;

206.    Although Plaintiffs are entitled to the Extraordinary Equitable Relief requested above, if the Court is unable to provide such relief Plaintiffs propose that Defendants pay all proceeds derived from the marketing, distribution, and sale of the so-called "Original Knox County Schools Coupon Book" into the Court for sequestration until a decision on the merits can be reached in this case. See In re Focus Media, Inc., 387 F.3d 1077, 1084 (9th Cir. 2004).

## CLAIMS FOR DAMAGES

## COUNT I – TRADEMARK AND TRADE DRESS INFRINGEMENT

207.    Plaintiffs restate paragraphs 1-196 above in support of Count I;

208.    School Coupons® is a registered trademark (Supplemental Register, serial number 75365161);

209.    Defendants were on notice of Plaintiffs' trademark claims in School Coupons®;

210.    Defendants Knox County Schools, Bacon, and Kerr violated Plaintiffs' trademark rights in the February Letter when they wrote, "the product that has been known as the School Coupons Campaign will now be known as the Knox County Schools Coupon Book;"

211.    The School Coupons® book trade dress is a non-functional design;

212.    The design is inherently distinctive or distinctive by virtue of having acquired secondary meaning;

213.    The proximity of the goods in question is identical;

214. There is a likelihood of confusion between the School Coupons® trade dress and the Defendants' 2010 Book and 2011 Book;

215. There is significant evidence of actual confusion between School Coupons® and the Defendants' 2010 Book and 2011 Book;

216. The 2010 Book and 2011 Book utilize the same market channels as the School Coupons® book;

217. Defendants were on notice of Plaintiffs' trade dress rights in the design, layout, and content of School Coupons®;

218. Defendants willfully and intentionally appropriated Plaintiffs' trademark and trade dress for use in the 2010 Book and the 2011 Book;

219. Defendant Knox County Schools earned a profit of $1,319,832.50 from the 2010 Book;

220. Plaintiffs have been damaged by Defendants' infringement and seek damages as a result.

## COUNT II - COPYRIGHT INFRINGEMENT

221. Plaintiffs restate paragraphs 1-196 above in support of Count II;

222. Defendants clearly had access to Plaintiffs' copyrighted materials;

223. Defendants were on notice of Plaintiffs' copyright claims to materials in School Coupons®;

224. Plaintiffs registered their copyright claims;

225. Defendants appropriated Plaintiffs' copyrighted materials for use in the 2010 Book;

226. Upon information and belief, Defendants appropriated Plaintiffs' copyrighted materials for use in the 2011 Book;

227. Defendant Knox County Schools earned a profit of $1,319,832.50 from the 2010 Book;

228. Plaintiffs have been damaged by Defendants' infringement and seek damages as a result.

## COUNT III – UNFAIR TRADE PRACTICES

229. Plaintiffs restate paragraphs 1-196 above in support of Count III;

230. Defendants have engaged in unfair and deceptive acts affecting the conduct of trade or commerce in the printing, distribution, marketing, and sale of the 2010 Book and the 2011 Book;

231. That Defendants' unfair and deceptive acts were willful;

232. Plaintiffs have been damaged by Defendants' unfair competition and seek damages as a result.

## COUNT IV – TORTIOUS INTERFERENCE

233. Plaintiffs restate paragraphs 1-196 above in support of Count IV;

234. Defendants contacted, and continue to contact, merchants participating the School Coupons® program to discourage the merchants from continuing their participation;

235. Defendants contacted, and continue to contact, local schools to discourage them from conducting business with Plaintiffs, both respecting the School Coupons® program and otherwise;

236. Defendants' statements and acts have caused merchants to not renew their participation in School Coupons®;

237. Defendants' statements and acts have undermined Plaintiffs' relationships with merchants who participated in School Coupons®;

238. Defendants' statements and acts have caused local schools to not conduct business with Plaintiffs;

239. Plaintiffs have been damaged by Defendants' tortious interference with contracts and seek damages as a result.

## COUNT V – LIBEL

240. Plaintiffs restate paragraphs 1-196 above in support of Count V;

241. Defendants made false and defamatory statements about Plaintiffs in memoranda and letters sent to schools and merchants;

242. Plaintiffs have been damaged by Defendants' libelous acts and seek damages as a result.

## COUNT VI – DEFAMATION AND SLANDER

243. Plaintiffs restate paragraphs 1-196 above in support of Count VI;

244. Defendants made false and defamatory statements about Plaintiffs in contacting school officials and merchants;

33

245. Plaintiffs have been damaged by Defendants' defamatory and slanderous acts and seek damages as a result.

## COUNT VII – CONVERSION

246. Plaintiffs restate paragraphs 1-196 above in support of Count VII;

247. Plaintiffs had a proprietary interest in the contractual documents between itself and merchants participating in the School Coupons® program;

248. Defendants damaged, altered, or destroyed defendants documents;

249. Plaintiffs have been damaged by Defendants' conversion and seek damages as a result.

## COUNT VIII – CIVIL EXTORTION

250. Plaintiffs restate paragraphs 1-196 above in support of Count VIII;

251. Defendant Bacon committed a criminal act, of using his position of public employment to demand a payment or compensation in return for the privilege of conducting business with Knox County Schools;

252. The Defendants acted, and continue to act, in concert to cancel Plaintiffs contracts with Knox County Schools, remove Plaintiffs from Knox County's approved vendor list, and take further actions to harm Plaintiffs business as retaliation for Plaintiffs refusal to make such a corrupt arrangement;

253. That the Defendants committed a criminal act, of engaging in unfair and deceptive acts affecting the conduct of trade or commerce in the printing, distribution, marketing, and sale of the 2010 Book and the 2011 Book;

34

254. The Defendants acted, and continue to act, in concert to engage in unfair and deceptive acts affecting the conduct of trade or commerce in the printing, distribution, marketing, and sale of the 2010 Book and the 2011 Book;

255. Plaintiffs have been damaged by Defendants' extortion and seek damages as a result.

**WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS PRAY FOR JUDGMENT AGAINST THE DEFENDANTS AS FOLLOWS:**

A. For this complaint to be filed and served upon the Defendants, requiring the Defendants answer made under oath within the time required by law;

B. That Plaintiffs be awarded damaged for Counts I-VIII in an amount to be determined at trial;

C. That, in addition to their damages, Plaintiffs be awarded $1,319,832.50 on Count I, pursuant to 15 U.S.C. §1117, with respect to sales of the 2010 Book;

D. That, in addition to their damages, Plaintiff be awarded 3x treble damages of $3,959,497.50 on Count I, pursuant to 15 U.S.C. §1117, with respect to sales of the 2010 Book;

E. That Plaintiff be awarded all of his reasonable attorney fees pursuant to 15 U.S.C. §1117 on Count I;

F. That, in addition to their damages, Plaintiffs be awarded an amount equaling profits earned by the Defendants, plus 3x treble damages on Count I, pursuant to 15 U.S.C. §1117, with respect to any sales of the 2011 Book;

35

G. That, in addition to their damages, Plaintiffs be awarded $1,319,832.50 on Count II, pursuant to 17 U.S.C. §504, with respect to sales of the 2010 Book;

H. That, in addition to their damages, Plaintiffs be awarded an amount equaling profits earned by the Defendants on Count II, pursuant to 17 U.S.C. §504, with respect to any sales of the 2011 Book;

I. That Plaintiffs be awarded 3x treble damages on Count III;

J. That Defendants be enjoined from further infringements on Plaintiffs' trademark, trade dress, and copyright rights;

K. That Plaintiffs be awarded all of their discretionary costs;

L. That Defendants be taxed with the costs in this matter;

M. That Plaintiffs be awarded post-judgment interest at the highest allowable rate by law;

N. For general relief.

Respectfully submitted,

LAW OFFICE OF RUSSELL L. EGLI, PLLC

Russell L. Egli, BPR#024408
Attorneys for the Plaintiffs
11470 Parkside Drive, Suite 201
Knoxville, TN 37934
(865) 304-4125

36

## OATH

I, Michael Scott Ward, verify that all of the above is true and correct and based

upon my own personal knowledge.

Michael Scott Ward

Sworn and subscribed before me
this 6th day of September, 2011

Notary Public

My Commission Expires: June 30, 2013

WENDY ROSE
STATE
OF
TENNESSEE
NOTARY
PUBLIC
KNOX COUNTY

37