UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

MICHAEL SCOTT WARD d/b/a )
FEREDONNA COMMUNICATIONS, *et al.*, )
 )
       Plaintiffs, )
 )
v. )   No.: 3:11-CV-438-TAV-CCS
 )
KNOX COUNTY BOARD OF EDUCATION, *et al.*, )
 )
       Defendants. )

## MEMORANDUM OPINION

This civil matter is before the Court on cross motions for summary judgment. Plaintiffs filed a Motion for Summary Judgment as to Plaintiffs' Trademark and Trade Dress Claims [Doc. 135] as well as a Motion for Partial Summary Judgment on the Determination of Profits for Purposes of 15 U.S.C. § 1117 and 17 U.S.C. § 504 [Doc. 133]. Defendants also filed a Motion for Summary Judgment [Doc. 139]. The parties filed responses to these motions [Docs. 145, 146, 148, 151] and replies [Docs. 152, 153, 154]. They also filed documentary support [Docs. 140, 147, 145]. Upon careful consideration of the parties' filings and the relevant law, the Court will grant defendants' motion and deny plaintiffs' motions.

## I.    Background

This litigation centers around coupon books that children sell to raise funds for their schools. Plaintiff Michael Scott Ward ("Ward") is citizen and resident of Knox

County, Tennessee [Doc. 141-1 ¶ 1].[1]  Plaintiff WeDo Fundraising, Inc. ("WeDo Fundraising") is a Tennessee corporation and Ward is its principal shareholder [*Id.* ¶ 2]. Plaintiff PrintVenture, Inc. ("PrintVenture") was a Tennessee corporation and Ward was its principal shareholder [*Id.* ¶ 3].  Ward, WeDo Fundraising, and PrintVenture all conduct business under the trade name Feredonna Communications ("Feredonna") [*Id.* ¶ 4]. Feredonna is a publisher with over eighteen years of experience in designing, branding, publishing, printing, and distributing fundraising materials, as well as organizing, marketing, managing, and conducting fundraising campaigns, including fundraising campaigns for schools and school districts in Alabama, Georgia, Ohio, and Tennessee [*Id.* ¶¶ 5–6].  Defendants are Knox County and Knox County Board of Education ("Knox County" or "defendants") [*Id.* ¶¶ 7–8].  "Scott Bacon and Mary Kerr were the two key people responsible for [the school-coupon program] inside of Knox County Government" [Doc. 139-2 p. 12].

"The concept of fundraising for schools through a system-wide sale of coupon books is not native to Knoxville, Tennessee" [Doc. 10 p. 2; Doc. 147 ¶ 3].  Rather, "Jim Fuller brought the concept [to Knox County] from Chattanooga, Tennessee in 1989[] [i]n exchange for an administrative fee per coupon book sold" [*Id.*]. Fuller established and managed the coupon book program for Knox County Schools under the name "Kids First" from 1989–91 [*Id.*].

---

[1]  Because the Court is entering an order granting plaintiffs' request to file a fourth amended complaint contemporaneously with this memorandum opinion, the Court cites to the proposed fourth amended complaint already in the record.

2

Plaintiffs were not involved with the 1989–90 coupon book, because, as Ward testified, "[a]t that point in time, I had very limited knowledge or exposure to the program" [Doc. 139-2 p. 2]. Ward further admitted that the idea or concept for coupon books with discounts was not something he originated, and he admitted the coupon books existed in Knox County "before [he] ever showed up to do their work" [*Id.* at 3]. In fact, Ward admitted that "coupon booklets like this, what I'd made as Exhibit 3, the outside copy of it, would be found throughout the United States" [*Id.*].

In 1991, Cheryl Harris won the contract from Knox County Schools to manage the coupon-book program, and she ran the program under the name "Class Coupons" [Doc. 10 p. 2; Doc. 147 ¶ 5]. For the 1993–94 coupon-book campaign, Knox County took the coupon-book program in-house and used the phrase "school coupons" [Doc. 139-1 p. 2]. Scott Bacon testified that he came up with the name "school coupons" [*Id.*]. Plaintiffs were not involved in the 1993–94 coupon book [Doc. 139-2 p. 31]. The 1993–94 coupon book uses the title "school coupons" on the cover [*Id.*].

Due to difficulties with printing and binding [Doc. 147 ¶ 6], defendants sought outside assistance with the coupon book. In 1994, Ward bid for and received a contract with Knox County "for a system-wide fundraising program centered around the sale of a coupon book" [Doc. 142-2 ¶ 11]. The name used by Knox County in 1994 for the coupon book plaintiffs printed was "school coupons," but as Ward admitted, "school coupons" was a name that had been used by Knox County prior to 1994 [Doc. 139-2 pp.

8–9].  Plaintiffs did not begin using the name "school coupons" on coupon-book fundraising products until 1994 [Doc. 142-1 ¶ 21; Doc. 147 ¶ 8].

From 1994 through 2009, plaintiffs continued to print coupon books for Knox County pursuant to various bid documents, and plaintiffs were paid for the work they did. [Doc. 139-2 p. 7].  According to plaintiffs, "Knox County was responsible for merchant recruitment for the book inside Knox County, and Feredonna was responsible for merchant recruitment outside Knox County, and for any regional or national merchant accounts" [Doc. 142-1 ¶ 36].  Feredonna's role included assistance with merchant recruitment outside the county, branded merchandise and materials, and other aspects of the program not traditionally provided by a printing company [*Id.* ¶ 13; Doc. 139-2 pp. 6–7].  One task included under the contract was printing the "Merchant Participation Applications" [Doc. 139-4] and the "Merchant Participation Agreements" for Knox County [Doc. 140-1].  All of these tasks were things Feredonna had been hired to do, and generally speaking, plaintiffs were paid for this work [Doc. 139-2 p. 7].

During this time period, plaintiffs also expanded their business into other markets, including Birmingham, Alabama; northeast Ohio; Nashville, Tennessee; north Georgia; and Montgomery, Alabama [Doc. 139-2 p. 10; Doc. 147 ¶ 13]. Ward testified that he produced various books at various times for these markets [*Id.*].

According to the United States Patent and Trademark Office ("PTO"), on or about September 29, 1997, PrintVenture Inc. d/b/a Feredonna Communications registered a trademark for "School Coupons" on the Supplemental Register, serial number 75365161

4

and Registration No. 2245216 [Doc. 139-3 Ex. B]. According to the PTO's records, the trademark covers "charitable fund raising services on behalf of schools effected through the distribution of books containing coupons which entitle the holders to receive discounts on dining, hotels, travel, consumer merchandise, movies and other leisure activities" in International Class 036 [Doc. 139-3 ¶ 26]. The trademark filed by PrintVenture for "School Coupons" covers services only (class 036) and does not cover coupon books [*Id*. ¶ 29 and Ex. B]. An office action was issued by the PTO on July 9, 1998, rejecting the mark as merely descriptive under Section 2(e) [*Id*. ¶ 27 and Ex. B]. In the office action, the Trademark Office examining attorney stated "[t]he mark is highly descriptive of applicant's services because it describes a feature of the services, namely coupons. In addition, the mark also describes the intended beneficiary of the services, namely, schools. Accordingly, the mark is refused registration" [*Id*.].

A response to the office action was filed on January 8, 1999, and the application was amended to register the mark on the Supplemental Register instead of the Principal Register [*Id*. ¶ 28 and Ex. B]. The PTO issued a notice of allowance and the mark was allowed to register as a Supplemental Registration on May 11, 1999 [*Id*.].

In conversation and in writing via letter to Bacon and Kerr, Feredonna informed Knox County Schools of its intention to register the "School Coupons" trademark [Doc. 147 ¶ 15]. When its trademark registration became effective, Feredonna began including the "®" symbol to denote a registered trademark wherever Feredonna used the "School Coupons" mark [*Id*. ¶16]. Feredonna reminded Bacon and Kerr by letter, dated January

5

19, 2000, that "School Coupons" was a federal trademark owned by Feredonna [*Id.* ¶ 17 and Ex. 1]. Bacon and Kerr consistently acknowledged that Feredonna owned the rights to the "School Coupons" mark, and there were never any arguments prior to this litigation over Feredonna's right to register the "School Coupons" mark [Doc. 147 ¶ 18].

Although no written agreement existed that allowed Knox County to use the trademark, Knox County used the trademark every year until 2009 [Doc. 139-2 p. 11]. 2009 was "the last year that [Knox County] used my trademark on a coupon book" [*Id.*].

In addition to claiming trademark rights, "Feredonna began claiming copyright rights to the School Coupons® coupon book and their *design, format, layout*, and contents that they were producing for the Knox County Schools as early as 1998, and perhaps earlier" [Doc. 142-1 ¶ 25]. And "Feredonna registered its copyright" [*Id.* ¶ 27].

In March 2008, a meeting was held between Feredonna and Knox County Schools to discuss the upcoming twentieth anniversary of the coupon program; Bacon, Kerr, another employee of Knox County Schools, Ward, and Alanna Fletcher, Ward's employee, were present [Doc. 142-1 ¶¶ 42–43]. Ward allegedly "suggested that the 20th anniversary campaign provided an opportunity to raise the price of the School Coupons® book . . . and to introduce a new discount card program that could be developed into a spin-off fundraising campaign" [*Id.* ¶ 44]. Bacon specifically stated that he did not want to raise the price of the coupon book [Doc. 139-2 pp. 12–13]. As to the discount card, Ward testified Bacon "wanted ownership of the card" [*Id.* at 13–15]. Ultimately, Bacon "dismissed the discount card and book concept" [Doc. 142-1 ¶ 50], and no one with any

authority at Knox County ever agreed to push Ward's discount card idea or concept [Doc. 139-2 p. 15]. However, Ward continued to develop his discount card, and he tried to sell the card in Blount, Anderson, and Sevier Counties [*Id.* at 16].

Ward finalized the discount card concept in January of 2009, "with the goal of introducing it as a spring fundraising program," and Ward began recruiting merchant participation in the discount card program [Doc. 142-1 ¶¶ 50, 52]. In April 2009, Ward received a telephone call from Bacon, in which Bacon allegedly informed Ward that he "caught wind of Ward's efforts to develop a working prototype of the card product, and he was furious" [*Id.* ¶ 54]. Bacon allegedly "threatened that no schools would sell the discount card without Bacon's 'involvement' and 'ownership'" [*Id.* ¶ 55]. Ward concedes that it is possible Bacon meant he wanted the discount card to go to Knox County or Knox County Schools as opposed to himself, personally [Doc. 139-2 p. 18].

In April of 2009, Ward, Kerr, and Bacon had a meeting in which the discount card concept was discussed [*Id.* 19–20; Doc. 142-1 ¶¶ 57–58]. Ward testified that the following exchange occurred during the April 2009 meeting:

> **Q. And you say that you wanted or that Bacon wanted to reap the profits personally as a middleman reselling to Knox County.**
>
> A. That was the impression I was given.
>
> **Q. Did Bacon say "I want to be the middleman reaping profits from Knox County"?**
>
> A. No, sir, he did not.
>
> **Q. Well, what did he say that gave you that impression?**

7

A. He made a very emphatic statement that he felt that I was overcharging on the card . . . and that he felt that I should reduce the price and give him ownership.

**Q. Now in your Paragraph 64, you say "or allow Bacon to take credit for the program."**

A. Yes, sir.

**Q. So, did Bacon say "either pay me money or let me take credit for this program?"**

A. That goes back to your question about benefits, possible benefits received and taking credit from the program if it were successful with –

**Q. Well, my question –**

A. --of possible benefit, and yes, he wanted to take credit for the program.

[Doc. 139-2 pp. 19–20]. Ward claims that Bacon intended to develop a discount card program through his office for Knox County Schools, not using an outside vendor, and admitted that if Bacon developed a discount card through Knox County Schools, "he's not doing it to get money for himself illegally" [*Id.* at 22–23].

Ward did not end up selling any of the discount cards to Knox County or any other county or school system [*Id*. at 16–17]. Following this April 2009 meeting, the relationship between Bacon, Kerr, and Ward "chilled," according to Ward [Doc. 142-1 ¶ 75]. For example, Ward claims that agents for Knox County began altering portions of the "Merchant Participation Applications," by cutting the bottom portion off of the application [Doc. 139-4; Doc. 139-2 pp. 24–29]. The application is to be returned to "Knox County Schools" not Michael Scott Ward, PrintVenture, Feredonna

8

Communications, or WeDo Fundraising [Doc. 139-4]. The Application identifies Mary Kerr and Scott Bacon, the two Knox County employees responsible for the coupon-book campaign, as those an applicant should contact for more information [*Id.*].

Section 2 of the Application, marked with a star during Ward's deposition, was the portion of the application that was cut off by Knox County employees [Doc. 139-2 pp. 28–29]. This portion contained the "Business Information" for the merchant participating in the coupon-book program [Doc. 139-4]. Ward admitted the information on the application belonged to Knox County [Doc. 139-2 p. 27].

Mr. Ward testified that, "in some years [Knox County] did pay for the applications and in some years I don't believe they did pay for the applications" [*Id.*]. Ward further testified:

> **Q: Okay. And that would have been your fault because you didn't send them a bill if they didn't pay for it, right?**
>
> A: Right.
>
> **Q: Okay. So they paid for this and that was their information that would have been on that sheet?**
>
> A: That would have been Knox County's information that would be on the sheet.

[*Id.*].

The merchants participating in the coupon-book program contracted with Knox County and not Mr. Ward or any of his companies. The Merchant Participation Agreement, which the merchant completed after the Merchant Participation Application [Doc. 139-4] was received and accepted by Knox County, states that "this agreement . . . .

9

[is between] the undersigned person, firm or corporation, hereinafter referred to as 'merchant' and the Knox County School System" [*Id.*]. The Merchant Participation Agreement goes on to state that, "KNOX COUNTY SCHOOL SYSTEM USE CONSTITUTES ACCEPTANCE OF AGREEMENT" [Doc. 140].

Plaintiffs lost their contract with Knox County for the printing of the coupon books after the conclusion of the 2008–09 coupon-book campaign, so the contract for the coupon books had to be rebid [Doc. 142-1 ¶ 76, 98, 147–155]. PrintVenture and WeDo Fundraising submitted identical bids on the rebid for the coupon book printing [Doc. 142-1 ¶ 156]. Walsworth Printing Company, Inc. ("Walsworth") placed an online bid at a significantly lower price and received the contract [*Id.* ¶ 157].

In January 2010, Bacon and Kerr sent a letter on behalf of Knox County Schools to past-participating merchants in the school-coupon program announcing the school system's intention to "re-brand" the program [*Id.* ¶ 123]. A follow-up letter was sent on February 5, 2010, which stated that "the product that has been known as the School Coupons Campaign will now be known as the Knox County Schools Coupon Book" and used the language "Same Book, New Look" [*Id.* ¶ 124 and Ex. 4]. Plaintiffs allege Knox County Schools created and distributed a coupon book that appropriated material trademarked, including trade dress material, and copyrighted by Feredonna. Following expiration of the contract between Plaintiffs and Knox County Schools, defendants have used the following mark for its coupon books: "The Original Knox County Schools Coupon Book" [*See* Doc. 142-2 Ex. 7]. Knox County Schools engaged a variety of

10

individuals not associated with plaintiffs to create a new design for the coupon books beginning in 2010, including Dion Dykes, Jennifer Faddis, Nathan Stufflebean, Amanda Johnson, and Melissa Tauscher [*See* Doc. 139-5].

## II.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002). "When reviewing cross-motions for summary judgment, [the Court] must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the

11

record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

In an order being entered contemporaneously with this memorandum opinion, the Court is granting plaintiffs' request to amend the complaint [Doc. 126]. The fourth amended complaint, though, does not moot the pending motions for summary judgment because, for reasons explained in the order granting the motion to amend, the fourth amended complaint is substantially identical to the third amended complaint. *See Graham v. City of Oklahoma City*, 859 F.2d 142, 144–45 (10th Cir. 1988) (initial motion for summary judgment properly granted where original complaint and amended complaint were "substantially identical" and plaintiff had "adequate notice and sufficient

opportunity to meet defendants' arguments contained in the initial motion for summary judgment" (footnote omitted)).

## III. Analysis

Before the Court are three motions for summary judgment. Defendants move for summary judgment on all claims asserted against them, and they ask the Court to dismiss the state-law claims to the extent the Court grants summary judgment in their favor on the federal claims. Plaintiffs move for summary judgment in a more limited fashion. They ask the Court to grant summary judgment in their favor on the trademark and trade dress claims, and they ask the Court to grant summary judgment on the determination of defendants' profits.

### A. Trademark Claim

"A trademark is 'any word, name, symbol, or device . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (alterations in original) (quoting 15 U.S.C. § 1127). To prevail on a trademark-infringement claim, a plaintiff must prove: "(1) ownership of a valid, protectable trademark," *The Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 749 (S.D. Ohio 2010) (citation omitted); that "(2) the defendant used the mark in commerce without the plaintiff's consent; and (3) [that] the use was likely to cause confusion," *Nagler v. Garcia*, 370 F. App'x 678, 680 (6th Cir. 2010) (citing *Hensley*, 579 F.3d at 609).

13

Plaintiffs argue they have a valid, protectable trademark, that defendants used that mark in commerce without plaintiffs' consent, and that defendants' use was likely to cause confusion among consumers. Defendants, on the other hand, argue that plaintiffs do not have a valid, protectable trademark for "School Coupons," that the trademark claim must fail because defendants' use of the mark is not likely to cause confusion among consumers, and that the fair-use doctrine bars plaintiffs from recovering against the defendants for infringement. The Court first turns to the arguments concerning the validity and protectability of the mark.

Plaintiffs argue that their "School Coupons" mark is valid and protectable because it is registered in the Supplemental Register and they have used the mark exclusively and consistently for approximately twenty years. They further assert that Scott Bacon has recognized that plaintiffs own the mark. Conversely, defendants argue that the mark is not valid or protectable because registration on the Supplemental Register does not afford the owner prima facie protection, defendants are a senior user of the mark, and the phrase "school coupons" is generic or descriptive and has not acquired a secondary meaning.

Regarding defendants' argument that they are senior users of the mark, defendants argue that Scott Bacon came up with that name for the fundraising program and that they first used the phrase "school coupons" in 1993 [Doc. 139-3 ¶ 37 and Ex. B; Doc. 139-1 p. 2], and that plaintiffs did not use first use the mark until February 12, 1994 [Doc. 139-3]. Plaintiffs counter that defendants are not senior users because plaintiffs were in fact the first users of the mark and informed defendants that they would be using the phrase

14

"school coupons" [Doc. 147]. They further claim defendants abandoned the use of the mark and that this defense is geographically limited to where defendants first used the mark—that is, the Knox County Schools.

"At common law, ownership of trademark or service mark rights is obtained by actual use." *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 571–72 (6th Cir. 2001) (citing J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 16:1 (4th ed. 2000)). "The first to use a mark in the sale of goods or services is the 'senior user' of the mark and gains common law rights to the mark in the geographic area in which the mark is used." *Id.* at 572.

"Ownership rights flow only from prior use—either actual or constructive." *Id.* "Federal registration of a trademark or service mark cannot create rights and priority over others who have previously used the mark in commerce, but federal registration is prima facie evidence of the registrant's ownership and exclusive right to use the mark, 15 U.S.C. §§ 1057(b), 1115(a), and constitutes constructive use of the mark." *Id.* (citation omitted). "'Constructive use' means that which establishes a priority date with the same legal effect as the earliest actual use of a trademark at common law." *Id.* (citation omitted).

"In the typical case in which a senior user applies for the federal registration, '[c]onstructive use will fix a registrant's nationwide priority rights in a mark from the filing of its application for registration.'" *Id.* "In the case in which a junior user applies for registration, however, the extent of the senior user/non-registrant's territory is frozen

15

as of the date of actual registration to the junior user." *Id.* (citations omitted). "The territorial rights of a holder of a federally registered trademark are always subject to any superior common law rights acquired by another party through actual use prior to the registrant's constructive use." *Id.*

Plaintiffs rely upon the affidavit of Michael Ward to support their argument that plaintiffs were using "school coupons" in the marketplace before defendants. Yet, this affidavit is not admissible in this regard because it contradicts Ward's earlier deposition testimony that plaintiffs did not begin using the mark until February 12, 1994 [*See* Doc. 139-2 p. 9]. *Peck v. Bridgeport Machs., Inc.*, 237 F.3d 614, 619 (6th Cir. 2001) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." (citation omitted)). Absent Ward's statement in his affidavit, there is a lack of any evidence that plaintiffs used the mark before 1994, and there is undisputed evidence in the record that defendants began using "school coupons" prior to 1994 [Doc. 139-2 p. 32; Doc. 139-1; Doc. 139-13], including, for example, a letter from the superintendent to the Knox County business community dated April 8, 1993, which states, "[t]he 1993-1994 campaign will be called 'School Coupons' and will once again focus on the sale of coupon books as our fund-raising vehicle" [Doc. 154-2].

Turning to plaintiffs' argument that defendants cannot be a senior user because defendants have expanded the territory in which they sell the coupon book, a senior user, like defendants here, is limited to the territory as of the date of the registration of the

16

junior user. *Allard*, 249 F.3d at 572. Plaintiffs registered the mark "School Coupons" on the Supplemental Register in 1999 [Doc. 139-3 pp. 8–9]. There is undisputed evidence in the record that, as early as 1993, the territory for defendants' coupon book sales included Sevier County, Lenoir City, Maryville City, and Alcoa City Schools [Doc. 154-1]. Thus, at least as to these areas and Knox County, defendants are a senior user. Yet, plaintiffs argue defendants abandoned the phrase "school coupons," *see Watec Co. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005) ("A person claiming senior rights in a trademark must establish not only that he or she used the mark before the mark was registered, but also that such use has continued to the present."), so the Court turns to the parties' arguments concerning the validity and protectability of the mark.

The registration of a trademark on the Principal Register creates a rebuttable presumption of valid trademark ownership. 15 U.S.C. § 1115(a); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 513 (6th Cir. 2007). It is undisputed, though, that plaintiffs' mark is registered, not on the Principal Register, but on the Supplemental Register. "Courts have recognized that '[s]upplemental registration . . . confers considerably fewer advantages than principal registration.'" *Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 08-CV-10983, 2008 WL 1735371, at *3 (E.D. Mich. Apr. 14, 2008) (first alteration in original) (quoting *In re Am. Fertility Soc'y*, 188 F.3d 1341, 1343 (Fed. Cir. 1999)). Indeed, one district court in this Circuit has recognized that supplemental registration does not afford a plaintiff prima facie protection as a valid trademark because the presence of the mark "on the Supplemental Register indicates a

17

preliminary determination that the mark is not distinctive of the applicant's goods." *Id.* (quoting 3 McCarthy on Trademarks and Unfair Competition § 19:36 (4th ed. 2003)). Thus, the Court must examine whether the mark is protectable because it is distinctive.

Marks are entitled to protection if they are distinctive. *Tumblebus*, 399 F.3d at 760–61, 761 n.4 (citations omitted). Marks described as "arbitrary," "fanciful," or "suggestive" are "inherently distinctive" and protectable, but "generic" marks are not. *Leelanau Wine Cellars*, 502 F.3d at 512–13 (citations omitted). "Descriptive marks" lie between these two spectrums and "enjoy the benefit of protection only if they develop a 'secondary meaning.'" *Id.* at 513 (citations omitted). A descriptive mark is one that describes "the intended purpose, function or use of the goods . . . the class of users of the goods; a desirable characteristic of the goods; or the end effect upon the user." *DeGidio v. West Grp. Corp.*, 355 F.3d 506, 510 (6th Cir. 2004) (ellipsis in original and citation omitted). "A descriptive mark achieves secondary meaning when 'in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product.'" *Leelanau Wine Cellars*, 502 F.3d at 513 (citation omitted).

Defendants argue that the mark "School Coupons" is a generic term that describes plaintiffs' product. Plaintiffs disagree, arguing that the phrase "school coupons" describes coupons that one might use to pay for school, and in support, they point out that no other coupon book in defendants' expert's report use the term "school coupons."

18

A generic term is understood as a "common descriptive" term, as opposed to a "merely descriptive term." *Natron Corp.*, 305 F.3d at 404 n.7. "A 'merely descriptive' mark, . . . is often said to identify a characteristic of the thing. It is very similar to an adjective." *Id.* (citing the example of "deep bowl," which is "merely descriptive" "because it informs one that they are deep in the bowl portion . . . . It is not, however, 'the common descriptive name' of the article (since) the implement is not a deep bowl, it is a spoon . . . ." (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10 n.11 (2d Cir. 1976))). The Court finds, based upon the evidence presented, including that of defendants' own expert, that "school coupons" is "merely descriptive" as opposed to "commonly descriptive" because it identifies the characteristic of the thing; that is, it describes the product as coupons for schools.

In light of this finding, the Court turns to the issue of whether the descriptive mark has acquired a secondary meaning. "A non-inherently distinctive mark . . . can have acquired distinctiveness through attachment of secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark or dress] is to identify the source of the product rather than the product itself.'" *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir. 2002) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)). To determine whether a descriptive mark has acquired a secondary meaning, courts look to the following factors: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6)

19

established place in the market; and (7) proof of intentional copying. *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 311–12 (6th Cir. 2001). "No single factor is determinative and every one need not be proven." *Id.* at 312.

Plaintiffs assert that they have registered the mark and used the mark in commerce exclusively and consistently for twenty years. Plaintiffs further assert that the brand has received media attention and advertising and that "School Coupons" has raised over $23 million for local schools, selling over 2,300,000 coupon books. In support, plaintiffs rely upon the expert witness report of Mario Sergio Golab [Doc. 136-3] and claim there is a presumption that the mark has taken on a secondary meaning. But plaintiffs cite no authority that this evidence creates a presumption of secondary meaning and, based upon the evidence in the record, the Court finds this media attention and sales information relates to sales of coupon books in Knox County [*See, e.g.*, Doc. 143-3 pp. 6–7]. Moreover, plaintiffs have put forth no proof of any consumer testimony, consumer surveys, or intentional copying. *See Herman Miller*, 270 F.3d at 312–13 (noting that while survey evidence is not the only relevant evidence, it "is the most direct and persuasive evidence"). Although plaintiffs argue that the letter sent to the Knox County business community in February 2010, demonstrates defendants intentionally copied their trademark because it references a "re-branding," no inference can be made from the text of the letter that defendants intentionally copied plaintiffs' "School Coupons" mark, even construing it in a light most favorable to plaintiffs.

In sum, considering all the evidence in the light most favorable to plaintiffs, the Court cannot find that, in the minds of the public, the primary significance of plaintiffs' "School Coupons" mark is to identify the source of the product rather than the product itself. The Court thus finds that summary judgment in defendants' favor is warranted.[2]

## B.   Trade Dress Claim

"Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), protects from infringement the unregistered 'trade dress' of a product." *Abercrombie*, 280 F.3d at 629. "Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, [that] make[s] the source of the product distinguishable from another and . . . promote[s] its sale." *Id.* at 630 (alterations in original) (citations and internal quotation marks omitted). "Trade dress involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Id.* (citations and internal quotation marks omitted). "[A]ny 'thing' that dresses a good can constitute trade dress." *Id.*

"[T]o recover for trade dress infringement under § 43(a), a party must prove by a preponderance of the evidence: 1) that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses, 2) that the trade dress is primarily nonfunctional, and 3) that the trade dress of the competing good is confusingly

---

[2] Because the Court finds that summary judgment is warranted in defendants' favor in this regard, the Court declines to address the parties' remaining trademark claim arguments.

similar." *Id.* at 629 (citations omitted). "The first two elements are the requirements for protectability, and the third element is the standard for evaluating infringement." *Id.*

Plaintiffs assert that they are entitled to summary judgment on their trade dress claim because their trade dress is distinctive and non-functional. Defendants argue that plaintiffs' complaint fails to state a claim upon which relief can be granted, that plaintiffs' trade dress is not distinctive, and that plaintiffs' trade dress is functional and thus cannot be protected.

Turning first to defendant's argument that plaintiffs' trade dress claim fails to state a claim, a plaintiff is expected to plead and prove a clearly articulated design or combination of elements and identify those discrete elements that it considers to be its trade dress. *See id.* at 635 (stating that a plaintiff is "expected to list the elements of the designs and the unique combinations it [seeks] to protect"). Courts have dismissed trade dress claims where plaintiffs fail to clearly articulate the specific design elements that compose the trade dress. *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 118 (2d Cir. 2001).

In paragraph 223 of the fourth amended complaint [Doc. 142-1], plaintiffs list the elements of their trade dress as including "the design, layout, and content of School Coupons®." In paragraphs 15 through 18, plaintiffs provide notice as to the specific elements comprising plaintiff's trade dress; plaintiffs allege they tabbed coupons with merchant names, developed cover photos for the coupon books, and developed standard working and offer descriptions for coupons. Moreover, plaintiffs have attached

22

photographic exhibits of its alleged trade dress [Doc. 142-2]. The Court thus rejects

defendants' arguments and turns to the merits of this claim. *See Abercrombie*, 280 F.3d

at 635 ("While the language of Abercrombie's complaint rides the cusp of sufficient

particularity, with its occasional overbreadth leaving some claims devoid of meaning, A

& F attached to its complaint photographic depictions of designs it claimed constituted its

trade dress and the record now contains volumes of photographic exhibits depicting its

garment designs and the design of its Quarterly."); *Dayco Prods., LLC v. Dorman Prods.,

Inc.*, No. 09-cv-13139, 2010 WL 3855221, at *3 (E.D. Mich. Sept. 28, 2010) (finding

complaint sufficient where complaint included detailed pictures of the products).

Distinctiveness may be established either: (1) by showing that the trade dress is

inherently distinctive, such that "its intrinsic nature serves to identify a particular source";

or (2) by showing an "acquired distinctiveness through an attachment of a secondary

meaning, which occurs when, in the minds of the public, the primary significance [of the

trade dress] is to identify the source of the product rather than the product itself."

*Abercrombie*, 280 F.3d at 635 (citations omitted). "[T]here is a distinction between trade

dress claims based upon the design of the product itself and the packaging of the

product." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, No. 1:10-CV-702,

2011 WL 768056, at *5 (N.D. Ohio Feb. 28, 2011) (citations omitted). Product

packaging can be inherently distinctive, but "[a] product's design or configuration . . . is

inextricably tied to the product itself, such that even the most unusual features of a

product's design cannot automatically identify which producer crafted the product

because consumers are not predisposed to treat design features as an indication of source." *Id.* (citation and internal quotation marks omitted). Thus, "no product configuration can meet the distinctiveness requirement of the Lanham Act by a showing of inherent distinctiveness but must rely instead on acquired distinctiveness, *i.e.*, a showing of secondary meaning." *Abercrombie*, 280 F.3d at 637 (citation omitted).

The Court concludes, as it has before, that plaintiffs' trade dress claim is based upon the design of the product, rather than the packaging of the product. Plaintiffs assert their trade dress is based upon, among other things, the format, layout, and content of their coupon book, including, for example, its size and shape, the featuring of a top-selling student on the cover, the featuring of the logo of the presenting sponsor on the bottom center of the front cover, and the display of the logos of other major sponsors in a vertical row on the side of the front cover. Further, plaintiffs claim that they designed a new format, which included standardized branding and placement for merchant sponsors on the cover and throughout the book, tabbed coupons with merchant names, and styles guides to standardize wording and descriptions for the coupons. Thus, plaintiffs' trade dress is based upon the design of the product and they must therefore demonstrate a secondary meaning to establish distinctiveness.

The Court finds that, construing the evidence most favorably to plaintiffs, plaintiffs' trade dress has not acquired a secondary meaning. The same seven factors discussed above are utilized to determine whether one's trade dress has acquired a secondary meaning: (1) direct consumer testimony; (2) consumer surveys; (3)

exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *Herman Miller, Inc.*, 270 F.3d at 311–12. Of these, the only factor plaintiffs address is copying. Plaintiffs submit the report of Mario Sergio Golab, who opines that the physical appearance of the booklets are "almost identical" in terms of size, shape, cover features, and paper [*See* Doc. 136-3].

Yet, even assuming intentional copying for purposes of this analysis, intentional copying is "only one of many considerations . . . and does not alone establish secondary meaning." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 419 (6th Cir. 2006) (concluding that "secondary meaning for any product design trade dress can not be inherent through evidence of copying" (citing *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000))). And while intentional copying can evince the "strong secondary meaning of a product," *Abercrombie*, 280 F.3d at 639, the Sixth Circuit has long held that use of consumer surveys as proof of secondary meaning is "favored." *Tumblebus*, 399 F.3d at 761 n.9.

Given that plaintiffs have offered, at most, evidence only of intentional copying, and given that there is no other evidence in the record supporting a secondary meaning, the Court finds that plaintiffs' trade dress has not acquired a secondary meaning. Therefore, summary judgment in defendants' favor is appropriate.[3] *See Star Pac. Corp. v. Star Atl. Corp.*, No. 08-04957 (SDW)(MCA), 2011 WL 2413150, at *7 (D.N.J. June

---

[3] Given this finding, the Court declines to address the parties' arguments concerning functionality.

10, 2011) (granting summary judgment in defendant's favor where plaintiff's only evidence of secondary meaning was intentional copying).

### C. Copyright Claim

To establish a copyright-infringement claim, a plaintiff must demonstrate: (1) ownership of a valid copyright and (2) that the defendant copied protectable elements of the work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004). "The first prong tests the originality and non-functionality of the work, both of which are presumptively established by the copyright registration." *Lexmark*, 387 F.3d at 534 (citations omitted). "The second prong tests whether any copying occurred (a factual matter) and whether the portions of the work copied were entitled to copyright protection (a legal matter)." *Id.* (citations omitted).

Defendants assert that the Court should dismiss the copyright claim because plaintiffs' expert has opined that plaintiffs have no claim of copyright infringement. Defendants further assert the Court should dismiss the copyright claim because plaintiffs do not have a valid copyright for the content they allege is protected and because defendants did not copy any protectable elements of any alleged copyrighted work.

Assuming plaintiffs have a valid copyright, the Court finds that plaintiffs have failed to put forth evidence creating a genuine issue of material fact regarding whether defendants copied any protectable elements of plaintiffs' alleged copyrighted work. "[A]nalysis of [this] prong requires the Court to examine whether the work at issue is

26

entitled to copyright protection as a matter of law." *Lexmark*, 387 F.3d at 534. In order to obtain copyright protection, the work must contain "originality." *Tiseo Architects, Inc. v. B & B Pools Serv. and Supply Co.*, 495 F.3d 344, 347–48 (6th Cir. 2007). "Originality . . . means only that the work was independently created by the author (as opposed to copied from other works), and that it possess at least some minimal degree of creativity." *Feist*, 499 U.S. at 345.

While "the threshold showing of originality is not a demanding one," *Lexmark*, 387 F.3d at 534, the Court finds plaintiffs have not put forth evidence creating a genuine issue of material fact that their "School Coupons" book was independently created by them. The record shows that Jim Fuller, who later became a "client" of Feredonna, brought the school coupon book idea to Knoxville in 1989 and called the coupon book "Kids First." Mr. Ward acknowledged during his deposition that the 1989 coupon book was not published by him, PrintVenture, or Feredonna [Doc. 139-2 p. 2]. He further admitted the idea or concept for coupon books with discounts was not something he originated, and he admitted the coupon books existed in Knox County before he "ever showed up to do their work" [*Id.* at 3]. Indeed, he admitted that "coupon booklets like this, what I'd make as Exhibit 3, the outside copy of it, would be found throughout the United States" [*Id.*]. Moreover, even if plaintiffs' work is original, the Court finds plaintiffs have not put forth a genuine issue of material fact that defendants copied that work because plaintiffs' own expert opines, "I found too many differences and not enough similarities to sustain a claim of substantial similarity to support a claim of

copyright infringement" [Doc. 136-3 pp. 10–12].   Thus, summary judgment in defendants' favor is warranted.[4]

### D.     State-Law Claims

To the extent the Court dismisses the federal claims, defendants ask the Court to decline to exercise supplemental jurisdiction over the state-law claims.   Because the Court is dismissing all of the claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over plaintiffs' state-law claims.  *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims."); 28 U.S.C. § 1367(c).

## IV.    Conclusion

For these reasons, the Court will **DENY** plaintiffs' Motion for Summary Judgment as to Plaintiffs' Trademark and Trade Dress Claims [Doc. 135] and Motion for Partial Summary Judgment on the Determination of Profits for Purposes of 15 U.S.C. § 1117 and 17 U.S.C. § 504 [Doc. 133] and **GRANT** defendants' Motion for Summary Judgment [Doc. 139].   All claims will be dismissed and the Clerk of Court will be **DIRECTED** to **CLOSE** this case.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

---

[4] Given the Court's findings regarding the trademark, trade dress, and copyright claims, the Court will deny plaintiffs' motion for a determination of profits.

28